Jack Carlton HOUSE,
Petitioner-Appellant,

v.

Charles BALKCOM, Warden, Georgia
State Prison, Respondent-Appellee.

No. 83–8368.

United States Court of Appeals,
Eleventh Circuit.

Feb. 13, 1984.

.Mary B. Westmoreland, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before HENDERSON and HATCHETT, Circuit Judges, and JONES, Senior Circuit Judge.

HATCHETT, Circuit Judge:

Jack Carlton House seeks reversal of the district court's denial of habeas corpus relief pursuant to 28 U.S.C.A. § 2254.[1] House, who had been sentenced to death for the murder of two 7-year-old boys, asserts that he was denied effective assistance of counsel during all phases of his trial, and that the admission of his involuntarily given confession violated the fourteenth amendment. Based upon the totality of the circumstances, we find House's counsel ineffective at all stages of trial. We reverse and remand to the district court with directions.

## I. FACTS

In 1973, Jack Carlton House, a 27-year old father of three, lived in Atlanta, Georgia, with his wife of eight years and his daughters. Although House had a history of alcoholism, he was regularly employed and supported his family. He had no criminal record other than traffic violations. House had completed the seventh grade and scored 77 on his last-completed I.Q. test.

In the early afternoon of April 14, 1973, a white male, identified only as wearing a dark hat, was observed sitting in the parking lot of an apartment complex in north-

John R. Myer, Atlanta, Ga., John Charles Boger, New York City, Anthony G. Amsterdam, New York University Law School, New York City, Seth P. Waxman, Washington, D.C., for petitioner-appellant.

1. Title 28 U.S.C.A. § 2254 provides, in pertinent part:

   (b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

   . . . .

   (d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear

   . . . .

west Atlanta, Georgia. The man, apparently drunk, staggered out of the parking lot between 2:15 and 2:30 p.m.

At about 2:30 p.m., Jack Carlton House, after drinking a half-pint to a pint of 100 proof vodka purchased moments earlier, and wearing a newly-purchased dark cowboy hat, walked down Clairmont Street. On Clairmont Street, 7-year-old Robert Eugene Dunn and his 7-year-old playmate, Johnny Ray Smith, watched House as he staggered down the street. The two boys ran towards House and began making fun of him. Robert's father called to the boys to leave House alone. The boys returned to the yard as House staggered down the street, but several minutes later they apparently decided to follow him on their bicycles.

At about 3 p.m. that day, a white male, identified as wearing a dark hat, was seen entering the neighborhood woods located on the corners of Mantissa and DeFoor Avenues. A witness observed two boys pushing their bicycles in the same direction that the man had gone. The two boys entered the woods. At some time past 3:30 p.m. and before 4 p.m., an obviously inebriated white male was seen walking away from the direction of the woods. The next day the nude bodies of the two boys were found in the neighborhood woods.

An autopsy report showed that the boys had been strangled and that one of the boys had been sodomized. Their clothing was piled several hundred feet away from the bodies. Their bicycles were found at the entrance to the woods. Police Detective Sgt. Fitzgerald, in charge of the at-scene investigation, canvassed the neighborhood in an attempt to gain information about the crime. An unnamed individual furnished Sgt. Fitzgerald with House's name. Other individuals described to Sgt. Fitzgerald an inebriated man whom they had seen staggering through the neighborhood.

On Sunday, April 15, shortly before noon, law enforcement officers located Jack House at his mother-in-law's home in Stockbridge, Georgia. The officers told House they wanted to talk with him because some-

one fitting his general description had been seen near the scene of a crime. House, in the words of Sgt. Fitzgerald, was "more than happy to cooperate." House, by his own admission, and by the testimony of other witnesses, was "half-drunk" when he left his mother-in-law's home.

House was interrogated at the police station for four to five hours. At 12:55 p.m., at the beginning of interrogation, House signed a waiver of rights form. Sgt. Fitzgerald and another detective were present when the waiver form was signed. During the course of the interrogation, other officers entered and left the interrogation room. During the period of interrogation House signed a confession stating that he murdered the two boys.

The trial testimony is sharply divided as to what occurred during the interrogation and how the confession was elicited. At trial, House testified he was taken to an interrogation room where Sgt. Fitzgerald verbally abused and threatened him. House testified he was denied water, called a "little queer-faced bastard," and told that if he didn't sign "the report" he was going to have his head blown off. House also testified that Sgt. Fitzgerald grabbed him by the hair of his head and jabbed him in the chest with the butt of a pistol. House further testified that Sgt. Fitzgerald held a gun to House's head, telling him that he was going to blow his brains out, and then asking, "how did you kill them?" House testified that Sgt. Fitzgerald slapped him, kicked him, and otherwise physically abused him.

Conversely, Sgt. Fitzgerald testified that he never hit House, and that House's waiver was signed voluntarily and without coercion. Det. McCoy, who was present much of the time, testified that House simply confessed.

Nothing in the record, including the testimony of the police officers, produces a clear indication of when House purportedly indicated that he wanted to confess. It is clear that House stayed in interrogation, without an attorney, throughout a variety of police procedures. Blood samples were taken

from House at 4 p.m. At 4:30 p.m., the officers took House's clothing to a laboratory for analysis. The officers also took fingernail scrapings from House at 5 p.m. House testified he requested a lawyer when the interrogation began. The officers deny that House made such a request.

House testified that Sgt. Fitzgerald told him that if he signed the confession, Fitzgerald would not hit or beat him anymore. Following this promise, according to House, he confessed, even though he did not commit the crimes.

According to House, he told the officers he had been drinking most of Saturday morning, that he bought a new black hat, and that he staggered down the street, inebriated. As he staggered along, two boys followed him half-way down the street making fun of him, but he paid the boys no attention and walked on. He then said he turned into the woods near his home because he was too drunk to continue. In the woods he went to sleep on the ground. House testified that his confession ended at this point. He asserts that the portion of the statement dealing with the murder and rape of the boys was fabricated by the police officers and inserted into the confession. House admits signing the confession; however, he testified that he did so because, following his beatings and intimidation, he saw no point in doing otherwise. After signing the confession, the officers took House to the scene of the crime, insisting that he show them where everything took place. House correctly identified where the boys' clothing had been found, but testified that he was able to do so by following the descriptions given of the site by the officers.

Two days after his arrest, House appeared before a magistrate. Until this time, he had been given no opportunity to make a telephone call. After the magistrate criticized the police officers for not allowing House an opportunity to make a telephone call, the officers allowed House to call his mother. His mother then retained Dorothy Atkins, a local attorney, who had represented the family in small civil matters.

The next day, Dorothy Atkins visited House in the jail. According to her testimony, House immediately began to cry upon seeing her, saying, "please don't let them beat me anymore." Dorothy Atkins testified that House kept talking about "the Sergeant" and his great fear of him rather than about the alleged crimes for which he was charged.[2] Dorothy Atkins testified that House had bruises and red marks over his body. Because of House's fear of remaining in the same facility, Dorothy Atkins waived his preliminary hearing to allow his immediate transfer to the county jail.

Based upon what she had seen, Dorothy Atkins requested that her husband and law partner, Ben Atkins, go to the county jail and see the bruises on House's body. Although Ben Atkins went to the jail at his wife's request, he was not representing House at that time, and did not consider himself to be representing House. His sole purpose for visiting the jail was to prepare himself as a potential witness. Ben Atkins also testified at trial and at various habeas corpus proceedings that House indicated to him that he had been beaten, and showed him bruises about his body, including bruises in the groin area.

### Pretrial Investigation

After the initial interview with House, Dorothy Atkins telephoned House's family, asking for their help. She testified that she was "stymied" as to what she should do in preparing a defense. Dorothy Atkins had

---

**2.** Dorothy Atkins testifies at various points that House was extremely agitated and fearful when she met him. At trial she stated:

> The first time I saw him was on the 19th of April. When I introduced myself to him he immediately started crying and saying, 'Please don't let them beat me any more.'
> . . . .

After talking with him and the denial and everything, I advised him the best thing to do under the present circumstances was to go ahead, he wanted to leave that place because he was afraid every instant of the Sergeant, all he knew at this time was the Sergeant
. . . .

never represented a defendant in a capital case. In preparing for trial, she spoke with House's mother and his wife. She did not visit the neighborhood in which the crime occurred. She did not attempt to interview the police officers and medical witnesses listed on the indictment. She filed no pre-trial motions and made no attempt to obtain discovery from the prosecutor.

Ben Atkins, who initially acted as his wife's potential witness, became lead counsel at trial. Dorothy Atkins asked her husband, Ben Atkins, to take charge of the case because she considered herself ill-prepared to handle it. She had prepared no defense. Ben Atkins testified that he did not know that he would be lead counsel on the case until two days before the trial began. Perhaps because Ben Atkins did not know that he would be responsible for handling the trial, he interviewed no witnesses, sought no discovery, and did not visit the scene of the crime. Although both Dorothy and Ben Atkins testified that they saw bruises on House's body when they visited him, neither attempted to take pictures of the bruises nor to call in medical personnel in order to substantiate their existence.

### The Trial

At House's trial the state presented three witnesses who testified that they had seen someone wearing a dark hat and resembling House, drunk and walking towards the woods where the crime occurred. The court interrupted the state's case to conduct a suppression hearing on the *Miranda* and confession issues. At that hearing, House testified that he had been beaten during interrogation, that he had requested an attorney, and that he had signed the confession only to stop the beatings. The state introduced policemen who testified to the voluntariness of House's confession. Ben and Dorothy Atkins testified about the bruises they observed. The trial court

found the confession to be voluntarily given and, therefore, admissible.

During the course of the trial, the state presented evidence that a spot of blood found on House's trousers matched the blood type of one of the murdered boys. The state also inadvertently presented evidence indicating that House's fingernail scrapings did not match materials found at the murder site. Dorothy Atkins testified at the habeas corpus proceedings that she first heard that a blood sample had been taken from House's clothing when the state presented its case at trial. Ben Atkins also testified that he was "completely surprised" by this revelation. Other evidence suggests, however, that the prosecution may have given Ben Atkins a copy of the laboratory report immediately prior to trial. In any event, neither Ben nor Dorothy Atkins formulated any defense strategy concerning the blood spot.

During the state's direct examination of Sgt. Fitzgerald, Ben Atkins, then lead counsel, was not in the courtroom, but outside parking his automobile. Despite this absence, Ben Atkins conducted the cross-examination of Sgt. Fitzgerald, having never heard his direct testimony.

House took the stand in his own defense. On direct examination House presented a free-wheeling narrative covering an incredibly wide range of topics.[3] At the conclusion of House's testimony, Dorothy Atkins requested that the court postpone the state's cross-examination of House until the next day so that she could prepare to attend a church "guild meeting." The trial court, somewhat hesitantly, granted the request. Thus, the state had overnight to prepare for House's cross-examination.

In the defense case, the Atkinses called five witnesses: themselves and three members of House's family. Both Atkinses testified as to what they saw when they went to visit House at the jail the first time.

---

**3.** House's complete direct testimony is quoted in the district court opinion from which this case is appealed. *See House v. Balkcom,* 562 F.Supp. 1111, 1155–65 (N.D.Ga.1983). The length of the testimony prevents its reproduc-

tion in its entirety, but House's narrative testimony is striking for its rambling, diffuse presentation, its lack of focus, and the absence of direction received from defense counsel.

House's sister testified that he was a heavy drinker. Judy House, the wife, responding to a question about the evidence of a blood spot on House's pants, testified that on the morning that the crime occurred, she and House had sexual intercourse. She further testified that her menstrual period was beginning and that she was "spotting," and that she believed this to account for the blood found on House's pants. House's brother testified that House was sexually normal, was not homosexual, and that House was very drunk on the afternoon of the crime. He also testified that House was unbruised and unmarked when the police picked him up for questioning.

During the prosecutor's closing argument, Ben Atkins was absent from the courtroom for approximately half of the argument.

The jury found House guilty of both murders. After the jury determined House's guilt, the sentencing phase of trial began pursuant to Georgia's then new death penalty statute. Neither Ben nor Dorothy Atkins had ever read the new Georgia death penalty statute, and testified to that fact at various times during the habeas corpus process. Both Atkinses were unaware that a separate sentencing stage of trial existed until they were in the middle of it. They prepared no evidence; they prepared no argument.[4] The jury returned a recommendation of death.

### Post-Trial Defense

A few days after the trial, Dorothy Atkins received a telephone call from one of the Houses' neighbors. The neighbor, Bobby Patterson, told Dorothy Atkins that another neighbor, Ruby Ramsey, had attended the trial and heard the state's evidence showing that the boys had been killed between 3 and 3:30 p.m. Bobby Patterson told Dorothy Atkins that she knew this evidence to be untrue, because both she and

Ruby Ramsey had seen the boys alive and well at 5 p.m. Michael Schumacher, an attorney sharing office space with the Atkinses, heard about the telephone call and visited both of the women in order to learn more. Ruby Ramsey told Schumacher that she knew both victims by name, and that she had seen both of them alive just after 5 p.m. Cathy Ramsey, the daughter of Ruby Ramsey, said she definitely remembered seeing the two victims, but could not remember the exact time. She knew she had seen them shortly before 6 p.m.

Schumacher drafted affidavits for the women, intending to submit them in support of a motion for new trial. Despite the potential importance of these recollections, and despite the fact that the Atkinses knew of their existence, the women's affidavits were never executed, and no motion for new trial was filed based upon this new evidence. Rather, the Atkinses filed a standard motion for new trial taken from a form book. After filing the motion, neither Ben nor Dorothy Atkins appeared in court to argue the motion. Because of their failure to appear, the trial court ordered the Atkinses to show cause why they should not be held in contempt of court. The record does not indicate the disposition of the show cause order.

The Georgia Supreme Court affirmed House's convictions and sentences. *See House v. State*, 232 Ga. 140, 205 S.E.2d 217 (1974). The United States Supreme Court denied petitions for certiorari and rehearing. *House v. Georgia*, 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976); 429 U.S. 873, 97 S.Ct. 189, 50 L.Ed.2d 154 (1976).

House petitioned for a writ of habeas corpus in the district court. A United States Magistrate received House's case for evidentiary hearings and recommendation. House amended his initial federal petition

---

**4.** Ben Atkins's argument at the end of the trial, presented in its entirety, was:

MR. ATKINS: May it please the Court, ladies and gentlemen of the jury, any lawyer who finds himself in this position cannot help but feel somewhere along the way there must be something that he could have done to have

brought about a different decision, he always does. I must admit I have never been in this position before.

I think there has been enough dramatics already, and all I would like to leave with you for your own sake is, "Vengence is mine, saith the Lord." Thank you.

for habeas corpus relief, adding an ineffective assistance of counsel claim. The magistrate heard the evidence relating to the ineffective assistance claim, including the testimony of two criminal defense attorneys who testified that in their opinion House did not receive effective assistance of counsel during, before, or after trial as judged by the minimum standards of the community. The magistrate also heard evidence showing that House's wife's blood type matched the blood type of the spot of blood found on his pants. House's wife testified that she met Dorothy Atkins in the Atkinses' office when House's mother retained her, but that following this meeting, Dorothy Atkins did not contact her before the trial. She also testified that, distraught, she called the Atkinses before the trial, asking whether or not they had developed any evidence. Ben Atkins responded in the negative, but insisted that they would still be going to trial. Before the magistrate, Dorothy Atkins testified that she performed no interview or preparation of the witnesses, other than meeting with House's wife during a recess after the state had introduced evidence about the blood spot. Both Ben and Dorothy Atkins testified that they had not read the death penalty statute. The magistrate received the stipulated testimony of House's mother stating that she never met with either of the defense counsel in order to discuss the substantive case, even though she called them several times before trial. House's mother stipulated that on one occasion she telephoned Ben Atkins to tell him that a man named Michael Pitts had called her home to tell her that he knew who committed the murders and that it was not House.

The magistrate determined that House was denied effective assistance of counsel at all stages in the proceedings. In doing so, the magistrate asserted that, "this court must determine not only whether attorneys were qualified by training and experience to represent an accused adequately, but also whether those attorneys actually performed the services that are reasonably adequate in their defense of the petitioner." *House v. Balkcom,* Magistrate's Report and Recom-

mendation, No. C 78–1471A (1981) (citations omitted). The magistrate then asserted that, "[t]he conduct of attorneys in a capital case calls for strict scrutiny," (citations omitted) because the death penalty is a different kind of punishment from others that are imposed. Applying those standards, the magistrate concluded that neither Ben nor Dorothy Atkins had afforded House effective assistance of counsel. He recommended that the writ be granted. The case was remanded for reconsideration. The magistrate issued a supplemental report and recommendation, made additional findings, and again recommended that the writ be granted. The district court, after holding supplemental evidentiary hearings, vacated House's death sentence because of the Atkinses' gross ignorance of the Georgia sentencing hearing phase of trial. The district court, however, denied the writ of habeas corpus. *See House v. Balkcom,* 562 F.Supp. 1111 (N.D.Ga.1983). The district court did find that House's representation during the pretrial investigation "was deficient in certain respects." *House v. Balkcom,* 562 F.Supp. 1111 at 1151. The court stated, however, that "these deficiencies have not been shown to have caused [House] actual and substantial prejudice." *House v. Balkcom,* 562 F.Supp. 1111 at 1151.

## II.  ISSUES

House asserts two issues in this appeal. He asserts that he was denied effective assistance of counsel at the pretrial, trial, and post-trial stages, in contravention of the sixth amendment. He also asserts that his confession was involuntarily given as a result of coercion and force.

### A.  Effective Assistance of Counsel

Prior to his trial, House contends that his attorneys did nothing more than meet him and speak to some of his family members by telephone. House asserts there was no investigation, no interviewing of witnesses, no preparation of a defense, no discovery, no visiting of the crime scene, and no trial preparation. Additionally, House asserts that the attorneys made little use, if any, of

evidence garnered from the state's laboratory reports which tended to substantiate his innocence. He asserts that counsel made even less use of testimony offered by neighborhood inhabitants which tended to show that the boys must have been murdered some time after House was home in bed.

The state of Georgia asserts that the district court's findings are correct in that no actual and substantial prejudice has been shown based on the allegations of ineffective assistance of counsel.

■ As both the district court and magistrate recognized, it is well established that a defendant in a criminal trial is entitled to effective assistance of counsel under the sixth amendment and due process clause of the fourteenth amendment. *See Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Effective assistance of counsel, such as will satisfy the requirements of the sixth amendment, is counsel "reasonably likely to render and rendering reasonably effective assistance given the totality of the circumstances." *Washington v. Strickland,* 693 F.2d 1243, 1250 (5th Cir. Unit B 1982) (en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983). *See United States v. Killian,* 639 F.2d 206, 210 (5th Cir.), *cert. denied,* 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981); *Mays v. Balkcom,* 631 F.2d 48, 52, n. 1 (5th Cir.1980). In considering the totality of the circumstances, a court looks to the quality of counsel's assistance from the time of initial retention through the time of appeal. *Goodwin v. Balkcom,* 684 F.2d 794, 805 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983). Additionally, in looking to the totality of circumstances, a court considers that more is required from trial counsel than from counsel whose defendant pleads guilty to the charge. *See Herring v. Estelle,* 491 F.2d 125, 128 (5th Cir.1974) (reasonably effective assistance is an easier standard to meet in the context of a guilty plea than in a trial). A court must also consider that, although a capital case is judged by the same standards as any other case, "[t]he seriousness of the charges against the defendant is a factor that *must be considered* in assessing counsel's performance." *Stanley v. Zant,* 697 F.2d 955, 962–63 (11th Cir.1983) (quoting *Proffit v. Wainwright,* 685 F.2d 1227, 1247 (11th Cir.1982)) (emphasis added).

■ In the Eleventh Circuit, a defendant convicted in a state court bringing a habeas corpus petition in a federal court ordinarily must show that ineffective assistance of counsel resulted in actual and substantial disadvantage to the course of his defense at trial. *Washington v. Strickland,* 693 F.2d at 1262. A reviewing court may excuse the prejudice requirement, however, in cases where counsel's ineffectiveness is "so pervasive that a particularized inquiry into prejudice would be 'unguided speculation.'" *Washington v. Strickland,* 693 F.2d at 1259, n. 26.

From the first moment of the Atkinses' involvement in House's defense there is confusion and lack of clarity. Ben Atkins's memory fluctuates as to exactly when he first learned he would try the case. At the habeas corpus hearings he testified:

> Mr. House employed my wife to represent Mr. House and I have the feeling that Mrs. Atkins made very good preparation, I don't know that. I don't know how much preparation she did do, but I didn't know that I was going to try the case until two or three days before the trial date. We discussed it just sort of abstractly, or whatever you want to, if that's the correct word, but I was not really aware that she was depending upon me to try the case.

On redirect, he testified:

> Q. You testified, Mr. Atkins, at some point your wife came to you and asked you to become involved in the direct trial of the case. I believe the term you used is you felt things were getting fuzzy. Do you recall if she stated to you that she did not feel adequate to handle the trial of this case?
>
> A. No, sir, I don't recall of it.
>
> Q. What did she say to you?

A. She is not very given to speak modestly, meekly, but I don't recall if she said she didn't feel adequate or not. But I have the impression that she wanted me to go into court with her and sit with her while she was trying it and I ended up having to try the case. I'm not positive that that is true. We may have agreed a day or two ahead of time that I would try it instead of her.

The firmest impression made by Ben Atkins's various comments at different points in the habeas corpus proceedings is that the defense trial strategy was confused, and his involvement in the case was never clearly delineated until the actual start of the trial. Moreover, his comments suggest that his involvement in the case occurred as part of his marital duty rather than because of his commitment to House:

Q. Do you recall how you became an active participant in the case?

A. I don't know, it began to get kind of fuzzy and rough. She figured both of us ought to go in on it, I think.

Q. Did she ask you?

A. She asked me to appear in the courtroom and try the case.

. . . .

Q. And did you agree at that time to do so?

A. Are you married?

Q. No, sir.

A. Yes, sir, I agreed.

It is uncontroverted that the Atkinses failed to seek defense witnesses. Even less excusable is their uncontroverted failure to interview the state's witnesses whom they knew would testify against House. Although the names of the state's witnesses had been provided, the Atkinses did not attempt to contact them. In fact, the testimony of Ben Atkins, taken during the May, 1980, habeas corpus proceedings, shows the extent to which preparation for trial was lacking:

Q. Prior to the first day of trial, sir, had you interviewed any of the State's witnesses in this case?

A. No, sir.

Q. Were you aware that the indictment promulgated in this case contained names of certain witnesses on its face?

A. Yes.

Q. Let me briefly go through them, there were several police officers whose names, I believe the record would reflect, were on that indictment. The officers Richard Fitzgerald, Charles Smegal and Douglas McCoy. It is your testimony, sir, that you did not interview those witnesses prior to the first day of trial?

A. That's correct.

Q. Had you spoken with them on the telephone or any other way short of a formal interview?

A. No, sir.

Q. Now the indictment also contained the names of certain persons from the State Crime Lab, Kelly Fite and Elizabeth Thomason. Had you interviewed those witnesses prior to the first day of trial?

A. No.

Q. Had you spoken with them in any other fashion?

A. No.

Q. The medical examiner, Dr. Robert Steivers was on that indictment, had you spoken with him?

A. No, sir.

Q. And there were several eye witnesses, briefly, T.H. Reed, John Dunn and T.C. England, Thomas Whitfield and James Smith. It is your testimony you had spoken with none of those witnesses?

A. That's correct.

Q. Do you have any written reports or other documents that reflected interviews with those defendants or those state's witnesses?

A. No, sir.

Q. Now did you during the trial, apart from on the stand, interview any of those witnesses at any time after the first day's testimony or at other times?

A. I don't recall, sir.

Q. Mr. Atkins, had you ever, prior to the first day of trial, been to the scene where this crime is alleged to have taken place?

A. No, sir.

Q. Had you visited the home of Jack House?

A. No.

Q. Or the home of Mrs. House, Jack's mother?

A. No.

Q. Did you take in any field trips as it were in connection with the preparation of this case?

A. No.

Q. Prior to the first day of trial had you interviewed Jack House?

A. Yes.

Q. Do you recall the circumstances?

A. It is my belief that I went to see Jack while he was in jail.

Q. On more than one occasion?

A. No, not more than two, if two.

Q. And do you recall how long you were with him on that occasion that—

A. Less than 30 minutes, I guess.

Q. When was the first occasion?

A. Well, I honestly don't know whether I talked to him in the City Jail. I'm of the firm belief that I didn't talk to him until he was in the county jail.

Q. Do you remember, sir, how long it was after his arrest that that conversation took place?

A. Less than a month, somewhere. It was several days after his arrest.

Q. And what did you discuss during that interview?

A. Sir, I couldn't recall.

Q. Did you speak with Judy House, Jack House's wife at any time prior to the first day of trial?

A. I don't believe so.

Q. Or Nancy Jones, Mrs. House's sister prior to the first day of trial?

A. I don't recall.

Q. Brantley House, the brother of Jack House, did you speak with him prior to the first day of trial?

A. No, sir.

Q. Do you recall any other possible defense witnesses with whom you spoke prior to the day the trial began?

A. Defense witnesses?

Q. Possible defense witnesses?

A. No, sir, I don't recall.

Ben and Dorothy Atkins sought no discovery from the prosecution or police. They did not know of the blood spot evidence until time of the trial. When the state presented evidence showing the blood was of the same type as one of the dead boys, the Atkinses were unable to present evidence showing that the blood was also of the same type as House's wife. The failure of the Atkinses to obtain rudimentary discovery is even more incredible upon learning the reasons behind this failure. Dorothy Atkins, questioned at the habeas corpus proceedings, stated:

Q. But, in general, prior to the trial did you make any attempt yourself to obtain the District Attorney's file in this case?

A. I did not make an attempt that I recall of getting his file. I had discussed the matter but very little because both of us were busy.

Dorothy Atkins's comments that she was "too busy" to properly seek rudimentary discovery, viewed in light of the fact that she asked for a continuance so that she could attend a church guild meeting, strongly indicates that her priorities were not rooted firmly with her client. She was "too busy" to learn crucial facts relevant to her client and his defense.

The trial court ordered a pretrial psychiatric examination for House. That examination, conducted before trial in June, 1973, revealed that House suffered from schizophrenia. Dorothy Atkins had no knowledge of her client's participation in such an examination, nor that it was ordered by the court. She learned about the examination during evidentiary proceedings in the district court nearly ten years later.

[6–8] The Atkinses' admitted failure to investigate the facts is unconscionable and falls below the level of performance by counsel required by the sixth amendment. In *Washington v. Strickland,* this court stated that when a lawyer fails to conduct a substantial investigation into any of his client's plausible lines of defense, the law-

yer has failed to render effective assistance of counsel. 693 F.2d at 1257. While we do not require that a lawyer be a private investigator in order to discern every possible avenue which may hurt or help the client, we do require that the lawyer make an effort to investigate the obvious. Pretrial investigation, principally because it provides a basis upon which most of the defense case must rest, is, perhaps, the most critical stage of a lawyer's preparation. *See Von Moltke v. Gillies,* 332 U.S. 708, 721–23, 68 S.Ct. 316, 322–23, 92 L.Ed. 309 (1948); *Powell v. Alabama,* 287 U.S. at 57, 53 S.Ct. at 59. In this regard, the Eleventh Circuit has enunciated the rule that effective representation, consistent with the sixth amendment, also involves "the independent duty to investigate and prepare." *Weidner v. Wainwright,* 708 F.2d 614, 616 (11th Cir.1983) (quoting *Goodwin v. Balkcom,* 684 F.2d at 805).

The Atkinses prepared no defense strategy. They filed no pretrial motions, sought no defense witnesses, failed to properly interview even their family-of-accused witnesses, and failed to interview the state's witnesses. The Atkinses did not visit the scene of the crime. Knowledge of the area may have helped them in preparation of their defense, and certainly would have helped guide House through his direct testimony.

At trial, Ben Atkins offered a haphazardly-constructed defense of impossibility, which was sure to be rejected because he offered no evidentiary support for such a defense. This is especially significant because both state and defense witnesses credit the man in the "dark hat" as being falling-down drunk, and, therefore, with some credible evidence it could have been effectively urged that a person in that physical condition could not effectuate sodomy and double murders. The Atkinses failed to take advantage of significant and possibly exculpatory evidence available from the state's own scientific tests, i.e., evidence suggesting that the materials resulting from nail scrapings and hair samples taken from House did not match samples taken from the crime scene.

The Atkinses' conduct during the guilt-innocence phase of trial shows an abysmal ignorance of basic trial tactics. The state of Dorothy Atkins's trial expertise is clearly shown by the fact that, in the process of interviewing her husband about the bruises he witnessed on House's body, he had to coach her from the stand.[5]

Even though at least three people, including a police officer, saw House's bruises, the Atkinses failed to call any of them to the stand, relying instead upon their own testimony. Even more disturbing is what one witness at the hearing characterized as their "lack of concern for the conduct of the

---

**5.** Dorothy Atkins's complete examination of her husband is as follows:

    Q. Are you Ben S. Atkins?
    A. Yes, I am.
    Q. With me representing Jack House?
    A. Jack House, yes, ma'am.
    Q. Mr. Atkins, did you see him at police court at all?
    A. No, ma'am.
    Q. Did you see him in the police—City Jail at all?
    A. No, ma'am.
    Q. Where did you see him first?
    A. I saw him out at Fulton Tower in the Fulton County Jail.
    DOROTHY ATKINS: This is all I have, just to show that that is the first place he saw and talked to him.
    THE WITNESS: *Ask me what took place out there, Mrs. Atkins, ask me what took place out there at the jail.* [Emphasis added.]

    Q. (By Dorothy Atkins) *You can state what took place out there.* [Emphasis added.]
    A. All right. When I got out there to talk to him he told me—what he told me may not be admissible, but he pulled down his breeches, I had him pull down his breeches and show me right in here (indicating) bruised places on his legs and up to his groin. There were several. I didn't count them, but there were several blue bruised spots there. He also had a round spot right here where he—where he had been punched with something, but it was round, and right here on the chest (indicating). I witnessed that myself and this was some—it was at least five or six days after the Sunday that he said it happened.
    DOROTHY ATKINS: Your witness.

trial itself." During the direct examination of Sgt. Fitzgerald, a key witness on the confession issue, Ben Atkins was not present in the courtroom. He returned to the courtroom to cross-examine Sgt. Fitzgerald even though he had not heard the direct testimony. Atkins also left the courtroom during the state's closing argument. His closing argument to the jury consisted of a short bible verse.

During direct examination, House rambled from subject to subject. Obviously, the Atkinses had not adequately prepared him to give testimony. By Ben Atkins's testimony, his total time spent with House preceding his direct testimony amounted to only thirty minutes, more or less. Much of that time was of necessity spent with House telling the Atkinses about the beatings, rather than the Atkinses helping House recall facts and structure a logical way to recite the facts before the jury.

The Atkinses presented no evidence at the sentencing phase of trial. Ben Atkins did not realize that there was a sentencing phase of the trial until he was in the middle of it. The district court held, correctly, that the Atkinses were ineffective at the sentencing stage of trial.

■ The Atkinses failed to file a motion for a new trial based on evidence submitted to them by House's neighbors. The district court, although not finding counsel ineffective, acknowledged the curiousness of the situation:

> Both Schumacher and Mrs. Atkins have testified that they did not pursue the matter because they ultimately decided the Ramsey-Patterson testimony could have been discovered in the exercise of due diligence prior to trial. However, that explanation does not make sense.

*House v. Balkcom,* 562 F.Supp. at 1132. While it is not the function of this court to second-guess the decisions of counsel as to whether or not counsel should file motions in particular cases, the explanation given here for not doing so has no realistic basis. Bobby Patterson approached the Atkinses because of what she had heard at the recently concluded trial. She could not

have come forward prior to trial. Failure to file a motion for new trial based on newly discovered evidence, standing alone, does not automatically constitute ineffective counsel. In the totality of the other failures of the Atkinses, it adds to the already ripe impression that no real representation occurred.

■ Effective assistance of counsel must not be determined by looking back with hindsight knowledge of what course of conduct would have produced a different result. Rather, all facts must be viewed "from the perspective of counsel, taking into account all of the circumstances of the case, but only as those circumstances were known to [counsel] at the time in question." *Douglas v. Wainwright,* 714 F.2d 1532, 1554 (11th Cir.1983) (quoting *Washington v. Watkins,* 655 F.2d 1346, 1356 (5th Cir.1981)). The failures of counsel on which we focus were for the most part known by counsel.

The district court concluded that the Atkinses' failure during the guilt-innocence phase of the trial was excusable except in two respects: that Ben and Dorothy Atkins failed to interview the state's witnesses, and that they failed to discuss with House prior to trial the state's evidence regarding the blood spot on his pants. *House v. Balkcom,* 562 F.Supp. at 1137, 1138. Moreover, the district court found that House's assistance during the sentencing phase of trial was completely ineffective in that neither of the Atkinses had ever read the applicable statute governing the sentencing hearing. While we agree with the district court's assessment of the Atkinses' ineffective assistance during the sentencing phase of trial, we are convinced that the Atkinses' level of representation was far below acceptable levels at all phases of the case. She was retained, they both saw bruises, and they both appeared for trial. Their state of preparation qualified them only as spectators.

■ In this circuit, a lawyer's pervasively substandard performance may mandate the granting of a writ of habeas corpus based on ineffective assistance of counsel.

*See Scott v. Wainwright,* 698 F.2d 427, 429–30 (11th Cir.1983) (defense counsel's failure to familiarize himself with the facts and relevant law made him so ineffective that the petitioner's guilty plea was involuntarily entered); *Washington v. Strickland,* 693 F.2d at 1257 (when counsel fails to conduct a substantial investigation into any of his client's plausible lines of defense, the attorney has failed to render effective assistance of counsel); *Young v. Zant,* 677 F.2d 792, 798 (11th Cir.1982) (where counsel is so ill prepared that he fails to understand his client's factual claims or the legal significance of those claims, counsel fails to provide service within the expected range of competency).

■ The district court, although recognizing certain deficiencies, found no prejudice. Prejudice is not required where the ineffectiveness of counsel is "so pervasive that a particularized inquiry into prejudice would be 'unguided speculation.'" *Washington v. Strickland,* 693 F.2d at 1259, n. 26. We so hold here. The haphazard nature of the Atkinses' defense, the failure to develop strategy of any consequence, and absenting themselves from crucial portions of the trial constitutes no representation at all. Given the totality of the circumstances, ineffectiveness of trial counsel has been amply shown.

### B. Confession

House also contends that he did not knowingly and intelligently waive his *Miranda* rights. He asserts that his confession was involuntarily coerced through the use of force. Additionally, because he is a person of low intelligence and little education, House argues it is unlikely that he could have made a knowing and intelligent waiver.

The state of Georgia asserts, on the other hand, that House's confession was properly admitted at trial because House knowingly waived his rights and signed a waiver form indicating that he did not wish to have a lawyer present.

■ It is well settled that a coerced or otherwise involuntary confession may not be admitted into evidence. *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). The district court found that the state court's findings on voluntariness were presumptively correct pursuant to 28 U.S.C.A. § 2254(d). *House v. Balkcom,* 562 F.Supp. at 1149.

Because we find that House's lawyers were so woefully inadequate in the collection, preservation, and presentation of evidence, and because a new trial is required in this case, we leave the confession issue for decision on the record made at the new trial.

### III. CONCLUSION

Accordingly, we hold that the level of assistance afforded by Ben and Dorothy Atkins on behalf of their client, Jack House, was deficient in that it fell below the minimum level of competence required by the sixth and fourteenth amendments. The case is remanded to the district court with directions to issue a writ of habeas corpus unless the state, within a reasonable time, sets the case for a new trial.

**REVERSED AND REMANDED WITH DIRECTIONS.**