824 F.2d 879
 Paul Edward MAGILL, Petitioner-Appellant,
v.
Richard L. DUGGER, as Secretary of the Department of
Corrections, State of Florida, Tom Barton, as
Superintendent of the Florida State
Prisons, Respondents-Appellees.
 No. 85-3820.
 United States Court of Appeals,
Eleventh Circuit.
 July 28, 1987.
 
 Michael A. Mello, Wilmer, Cutler & Pickering, Washington, D.C., Philip J. Padovano, Tallahassee, Fla., for petitioner-appellant.
 Paul Hoffman, Joan Howarth, Los Angeles, Cal., amicus curiae, ACLU of Southern California.
 Steve Forester, Miami, Fla., amicus curiae ACLU of Florida.
 Robert A. Butterworth, Atty. Gen. of Florida, Margene A. Roper, Asst. Atty. Gen., Dept. of Legal Affairs, Daytona Beach, Fla., for respondents-appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before FAY, JOHNSON and CLARK, Circuit Judges.
 CLARK, Circuit Judge:
 
 
 1
 Paul Magill appeals from an order of the district court denying habeas corpus relief from his murder conviction and death sentence. Because we find that the sentencing proceeding which resulted in a death sentence was prejudiced by the combination of trial counsel's ineffectiveness and the advisory jury's failure to consider nonstatutory mitigating circumstances, we reverse.
 
 I. BACKGROUND
 
 2
 The facts surrounding this homicide were, with minor exceptions, undisputed at trial and were derived mostly from Magill's taped confession and in-court testimony. Magill was a seventeen year old high school student when, on December 23, 1976, he robbed a convenience store near his home in Belleview, Florida. At gunpoint, he forced the store clerk, Karen Sue Young, to give him all the cash on hand. Realizing the clerk would call the police as soon as he left, Magill decided to take her away from the store so she would not have access to a telephone. Magill drove Ms. Young to a wooded area, but instead of abandoning her as originally intended, he forced her from the car and raped her. While returning to the car, Magill again realized that Ms. Young would be able to identify him as the robber. As they were walking back to the car, Magill shot Ms. Young in the side of the head at point-blank range. After she fell, Magill shot at her head but missed, and then shot her in the chest. He dragged her body into some bushes and drove off.[1] Within a few minutes, he was arrested by police and confessed to the crimes later that same day.
 
 
 3
 Magill pled not guilty and was tried for armed robbery, involuntary sexual battery, and first degree murder.[2] Defense counsel initially considered an insanity defense. Pursuant to the trial court's order, Magill was examined by Dr. Carrera and Dr. Barnard to determine whether he was competent to stand trial and to determine whether he was insane at the time of the crime. Both psychiatrists found Magill was competent and that he was not legally insane at the time of the crime. Counsel then abandoned the insanity defense and instead attempted to convince the jury that Magill was guilty of second degree murder. The jury rejected this argument and convicted Magill on all counts.
 
 
 4
 Testimony at the sentencing phase and, to a greater extent, at a post-conviction hearing brought to light several bizarre (although non-violent) instances from Magill's past which indicated emotional disturbance. In 1972, at the age of thirteen, Magill was arrested in New Jersey for indecent exposure. Pursuant to a court order, he started seeing Dr. Martinez-Monfort (a psychologist) in Puerto Rico, where Magill's family lived. Dr. Martinez-Monfort, who was not contacted to testify at trial, testified at a post-conviction hearing that Magill was "extremely poorly equipped to enter adolescence," had no capacity to handle his sexual drives, and had very little inner control over his aggression. Dr. Martinez-Monfort claimed he was not surprised when told that Magill had committed crimes of violence in 1976. Rule 3.850 Hearing Transcript at 46. After moving with his family to Florida, Magill (then 15 years old) again was arrested for exposing himself. Shortly thereafter, according to his mother's sentencing phase testimony, he attempted to cut his wrists when his father refused to buy him a motorcycle. Trial Transcript at 508. He would, on occasion, run away from home. Id. at 509.
 
 
 5
 Magill's behavioral problems intensified after his father died in late 1975, almost exactly one year before the murder of Ms. Young. After being arrested for retail theft, Magill began to see Terry Wagner, a probation counselor with the Division of Youth Services. Ms. Wagner saw Magill from September, 1976 until December, when the homicide was committed. She testified that Magill had great difficulty expressing emotion, and that his antisocial behavior likely was a result of repressed emotion. According to Ms. Wagner's sentencing phase testimony:
 
 
 6
 Well, on stealing things and exposing himself. It was almost like things would get to a point that he couldn't stand it anymore and he would have to do something and he would do it in those manners.
 
 
 7
 Trial Transcript at 515. This analysis was concurred in by Dr. Bruce Hartley, a clinical psychologist who saw Magill from July, 1976 until December, 1976, and by Murney McCroskey, one of Magill's high school teachers. Magill testified that he robbed the convenience store because he was angry with his mother and needed money to run away from home.[3]
 
 
 8
 Dr. Barnard, one of the court appointed psychiatrists, was called by Magill's counsel during the sentencing phase. He testified that he "saw no indication of a major psychotic illness or a major neurotic illness or of a hard core character disorder." Trial Transcript at 524. On cross-examination, he explained that Magill felt remorse for his actions but offered his opinion that Magill was not under the influence of extreme mental or emotional disturbance at the time he committed the crime, thus negating the presence of a statutory mitigating circumstance.
 
 
 9
 The final witness in mitigation was Magill. He testified, as he had during the guilt phase, that he planned the robbery ten minutes before it happened and that he did not plan to rape and murder the victim until just before he committed those acts. The trial court did not permit him, however, to express his feelings regarding his crimes nor did the court permit him to make a general statement to the advisory jury.
 
 
 10
 The jury recommended that Magill be given the death sentence. After examining a presentence report, the court accepted the jury's recommendation. In its findings of fact, the court found the following statutory aggravating factors: (1) the murder was committed while the defendant was engaged in the commission of, or flight after committing, the crime of robbery and rape [Fla.Stat. Sec. 921.141(5)(d) ]; (2) the capital felony was especially heinous, atrocious and cruel [Fla.Stat. Sec. 921.141(5)(h) ]; and (3) the capital felony was committed in connection with the crime of robbery which was perpetrated for pecuniary gain [Fla.Stat. Sec. 921.141(5)(f) ]. The court also noted that Magill committed three felonies during this criminal episode. The court found that these aggravating factors outweighed any mitigating circumstances.
 
 
 11
 Magill's conviction was affirmed on appeal, but the Florida Supreme Court vacated the death sentence because the trial court failed to specify the mitigating circumstances which it considered in imposing sentence. See Magill v. State, 386 So.2d 1188 (Fla.1980), cert. denied, 450 U.S. 927, 101 S.Ct. 1384, 67 L.Ed.2d 359 (1981) (Magill I ). Appellant was then resentenced by the trial court sitting without a jury. The court, relying on the presentence report and the original jury's recommendation, again sentenced Magill to death. Along with the aggravating factors found at trial, the court found three mitigating circumstances: (1) that Magill was seventeen years old at the time of the crime [Fla.Stat. Sec. 921.141(6)(g) ]; (2) that Magill had no significant prior criminal record [Fla.Stat. Sec. 921.141(6)(a) ]; and (3) that Magill's father passed away on December 28, 1975.[4] This death sentence was affirmed on appeal. Magill v. State, 428 So.2d 649 (Fla.), cert. denied, 464 U.S. 865, 104 S.Ct. 198, 78 L.Ed.2d 173 (1983) (Magill II ). Thereafter, Magill moved for post-conviction relief pursuant to Fla.R.Crim.P. 3.850. An evidentiary hearing was held on Magill's ineffective assistance of counsel claim, and relief was denied. See Magill v. State, 457 So.2d 1367 (Fla.1984) (Magill III ).
 
 
 12
 Magill then filed a petition for a writ of habeas corpus in the district court pursuant to 28 U.S.C. Sec. 2254. The district court denied Magill's request for an evidentiary hearing and denied relief, although the court issued a certificate of probable cause to appeal. We stayed appellant's execution, and now reverse.
 
 II. ISSUES PRESENTED
 
 13
 Appellant advances five claims of constitutional error with respect to his conviction for first degree murder and sentence of death. He alleges that: (1) trial counsel rendered ineffective assistance at the guilt and penalty phases of trial; (2) the trial court improperly instructed the jury not to consider evidence of nonstatutory mitigating circumstances; (3) a member of the jury venire was improperly excused for expressing reservations about capital punishment as applied to a minor; (4) the "heinous, atrocious and cruel" aggravating circumstance is unconstitutional on its face and as applied to this case; and (5) the death penalty is cruel and unusual punishment for anyone who commits an offense while under the age of eighteen. As is explained below, because Magill's first two claims warrant that his death sentence be vacated, we need not reach the merits of claims four and five. We do, however, find that any death sentence which may result from the resentencing permitted by this opinion should be stayed pending the Supreme Court's resolution of a case presenting the issue raised in claim five. Because claim three raises a challenge to Magill's conviction, we will discuss that issue below.
 
 III. INEFFECTIVE ASSISTANCE OF COUNSEL
 A. Pertinent Facts
 
 14
 The facts relevant to this issue were developed at an evidentiary hearing conducted in state court pursuant to Fla.R.Crim.P. 3.850. The evidence adduced at this hearing convinces us that Magill's death sentence resulted from "a breakdown in the adversary process that renders the result unreliable." Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). As a result, his death sentence must be vacated.
 
 
 15
 Hale Stancil, then a part-time assistant public defender, was selected by the public defender's office to defend Magill. Stancil, now a Marion County Court Judge, had been lead counsel in one prior capital case. He deposed three of the state's twenty-five proposed witnesses, filed several pretrial motions, and met with Magill on at least two occasions prior to trial. Stancil also met periodically (approximately once a week) with Robert Pierce, the head of the local public defender's office, to discuss the Magill case as well as Stancil's other cases. Initially, the defense strategy was to establish an insanity defense. When two court appointed psychiatrists submitted their opinions that Magill was legally sane at the time of the crime, Stancil decided to abandon the insanity defense in favor of an attempt to show that the homicide was not premeditated.
 
 
 16
 On the first day of jury selection, in a move which surprised both Stancil and Magill, Pierce came into the court room and announced that he was going to try the case.[5] He introduced himself to his client approximately fifteen minutes before the proceedings began. Pierce had not participated in the preparation of pretrial motions, nor had he attended any of the depositions. When jury selection began, according to Stancil, "[Pierce] was aware of the factual allegations of the state and the indictment. He was aware of those facts and he was aware of basically what the case consisted of." Rule 3.805 Hearing Transcript at 122.
 
 
 17
 Once the trial began, Pierce conducted the defense on his own. Stancil wanted to raise certain objections early in the trial, but was "advised" that Pierce would "handle it." Rule 3.850 Hearing Transcript at 133. Pierce delivered a short opening argument[6] during which he did not deny the facts the prosecution intended to prove and said that the burden of proof was not important because the defense was "not arguing the proof" and was "not even arguing the guilt." Trial Transcript at 245-46. He cross-examined some, but not all, of the state's witnesses. The only defense witness was Magill, who testified that he had no explanation for what he had done and that he felt remorse. He also testified that he had no control over his actions after he took the victim into his car and that the killing was done on an "impulse." On cross-examination, Magill was asked (without objection from Pierce): "So, you're guilty of Count four of the indictment of premeditated murder when you shot her the second time, aren't you?"[7] Magill responded that he was guilty of first degree murder. Trial Transcript at 434-35.
 
 
 18
 In his initial closing argument,[8] Pierce again told the jury that Magill was guilty. He then asked the jurors to listen to the court's instructions regarding second degree murder, third degree murder, and manslaughter before rendering a verdict. He concluded by referring to Magill's testimony regarding his state of mind on the day of the murder, asking that the jury save Magill's life. In his rebuttal closing argument,[9] Pierce for the first time specifically suggested that his defense theory was that Magill was guilty of second degree murder. He did not at any time attempt to explain how the evidence supported a second degree murder verdict nor did he explain Magill's testimony that the killing was premeditated.
 
 
 19
 After the jury returned its guilty verdict, Pierce left the courtroom and did not return. As Stancil later explained, "he didn't tell me why [he was leaving], he just said he was going back to Leesburg." Rule 3.850 Hearing Transcript at 128. As a result, Stancil was Magill's counsel for the sentencing phase.
 
 
 20
 Pierce, who is now retired from the practice of law, testified at the 3.850 hearing, but was unable to remember anything about his handling of Magill's defense.[10] In fact, he was unable even to recall that he had tried the case. He did not recognize Magill at the hearing, nor could he identify a picture of Magill taken shortly after his arrest. He was unaware that Magill had been given the death penalty. When asked to read a transcript of his opening statement in the case, he thought the defense was either insanity or second degree murder. In sum, he was unable to shed any light on the question of whether his actions at trial were the result of trial strategy. Stancil testified at the hearing and indicated that he "would have done things differently" if he were trial counsel during the guilt phase. Rule 3.850 Hearing Transcript at 177. Although Stancil for the most part attempted to justify Pierce's actions, he ultimately concluded that Pierce "was not prepared to try the case." Id.
 
 B. Analysis
 
 21
 Under Strickland, in order to establish a claim that counsel rendered constitutionally ineffective assistance, a habeas petitioner must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. 466 U.S. at 687, 104 S.Ct. at 2064.
 
 
 22
 This case presents a clear example of attorney performance which is outside the wide range of reasonable professional assistance. It is without the aid of the "distorting effects of hindsight," see Strickland, 466 U.S. at 689, 104 S.Ct. at 2065, that we conclude that Pierce was woefully unprepared to defend Magill and that his lack of preparation caused him to make several serious errors during the guilt phase of the trial.
 
 
 23
 Magill's allegations that several of Pierce's acts or omissions during trial constituted ineffectiveness must be assessed in light of Pierce's lack of pretrial preparation. The district court erred by considering Stancil and Pierce collectively as "counsel" thereby attributing Stancil's pretrial preparation to Pierce. Although two attorneys can often be considered as co-counsel, to do so in this case would be erroneous. When Stancil and Pierce discussed this case prior to trial, they did not do so with the intent that Stancil was preparing Pierce to present the case in court. They merely discussed this case as they did Stancil's other cases. Stancil was surprised when Pierce showed up on the first day of trial and took over the case. Although Pierce technically had access to Stancil's case file, there is no suggestion he ever studied it. We cannot conclude that Magill's "counsel" interviewed witnesses and interviewed the defendant. Magill's counsel during the guilt phase was Pierce, not Pierce and Stancil. Stancil testified that all decisions regarding the guilt phase (i.e., objections, advising Magill to testify, opening and closing arguments) were made by Pierce alone. Thus, in examining Magill's claim of ineffective assistance during the guilt phase, we consider Pierce's actions in light of Pierce's failure to prepare for the trial and its possible outcome.
 
 
 24
 One of the primary duties defense counsel owes to his client is the duty to prepare himself adequately prior to trial. "Pretrial preparation, principally because it provides a basis upon which most of the defense case must rest, is, perhaps the most critical stage of a lawyer's preparation." House v. Balkcom, 725 F.2d 608, 618 (11th Cir.), cert. denied, 469 U.S. 870, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984). See Weidner v. Wainwright, 708 F.2d 614, 616 (11th Cir.1983) ("At the heart of effective representation is the independent duty to investigate and prepare") (quoting Goodwin v. Balkcom, 684 F.2d 794, 805 (11th Cir.1982)). Although all criminal defendants are entitled to the effective assistance of counsel, "the seriousness of the charges against the defendant is a factor that must be considered in assessing counsel's performance." Proffitt v. Wainwright, 685 F.2d 1227, 1247 (11th Cir.1982) (citing Washington v. Watkins, 655 F.2d 1346, 1357 (5th Cir. Unit A Sept.1981), cert. denied, 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982)). In a case, such as this one, where the state has made clear prior to trial its intention to seek the death penalty, the defendant certainly is entitled to more than a counsel who is "basically" aware of the underlying facts of the case.[11]
 
 
 25
 Pierce's lack of involvement in this case prior to trial is similar to counsel's inept preparation in House v. Balkcom, 725 F.2d 608 (11th Cir.), cert. denied, 469 U.S. 870, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984). In House, the defendant's original attorney realized several days prior to trial that she was unprepared to handle a capital murder trial. Two days prior to trial, she enlisted the aid of her husband, who was also an attorney, and asked him to try the case. We noted that counsel spent only thirty minutes with House prior to House's guilt phase testimony, and that as a result House's testimony rambled from subject to subject without direction. Id. at 619. Among counsel's many errors was his failure to develop and present a coherent theory of defense and his inadequate closing argument to the jury. The facts of House indicate the dangers which are present when counsel assumes control of a capital case shortly before trial without having been involved in pretrial investigation. Pierce met with Magill for only 15 minutes prior to Magill's direct testimony and, like counsel in House, failed to discuss his client's impending testimony during this short meeting. Unlike in House, where defendant's testimony merely was not as helpful as it could have been with proper preparation, Magill's testimony virtually destroyed his case. Pierce, like counsel in House, failed to develop and present to the jury the defense theory that Magill committed the killing without premeditation. Finally, we note that Pierce's belated entry into this capital case was even less justified than counsel's belated entry in House. In House, counsel took over the case after defendant's original counsel, who ordinarily did not practice criminal law, realized she was unable to defend the case effectively. Pierce took this case over, even though Magill was being represented by a competent criminal defense attorney who had tried one capital case and who was adequately prepared to try this case. As in House, Pierce's handling of Magill's trial was so filled with serious error that we cannot say he provided Magill with the reasonably effective assistance of counsel guaranteed by the Sixth Amendment.
 
 
 26
 Magill alleges that many of Pierce's actions during trial constituted ineffective assistance. We need discuss only a few of these alleged errors.[12] First, the evidence shows that Magill was put on the witness stand to testify without having been prepared either for direct or cross-examination. One of counsel's primary duties is to "consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." Strickland, 466 U.S. at 688, 104 S.Ct. at 2065. The decision whether to allow a criminal defendant to testify must be made by the defendant with the informed advice of counsel. See ABA Standards for Criminal Justice 4-5.2(a) (1980). Under normal circumstances, we would be unlikely to second guess counsel's actions in this advisory capacity. We conclude on the facts before us, however, that attorney Pierce's conduct in this regard was anything but "sound trial strategy." Pierce first met Magill fifteen minutes before the trial started. Magill testified, without contradiction, that no strategy was discussed during this very short meeting and that Pierce never prepared him for his testimony. Rule 3.850 Hearing Transcript at 223. Moreover, Stancil testified that he did not personally prepare Magill for his guilt phase testimony nor did he give Pierce any advice regarding putting Magill on the witness stand. Id. at 127, 135. Under these circumstances, counsel simply abandoned his duty to assist Magill in the decision whether to testify in his defense.
 
 
 27
 Although there was no strategic purpose in Magill taking the witness stand, counsel had the duty to minimize the dangers of his decision that Magill should testify. Magill testified, for the most part, in a narrative during which he explained that he was acting on impulse during the murder. Counsel then questioned Magill regarding his prior difficulties with the law, including his indecent exposure arrests and arrests for retail theft. Although much of Magill's testimony during direct examination was irrelevant to the question of whether the killing was premeditated, we cannot say that counsel's direct examination was unreasonable. The severe damage came during cross-examination. The sole defense (which, at the time, still had not been explained to the jury) was that the murder was not premeditated. Indeed, Magill maintained that the first shot he fired at the victim's head was not planned in advance. The prosecutor then began to discuss the second and third shots fired to the head and chest. As to these, Magill testified they were planned and that he intended these shots to kill the victim. Counsel failed to object when the prosecutor asked Magill to render his opinion whether he was guilty of the crime of first degree murder. The prosecutor's questions clearly were leading to this end, yet counsel sat silently while his client told the jury he was guilty of capital murder. This devastating testimony points up two crucial errors by counsel. First, counsel should have discussed with his client the possibility that the state would seek to prove premeditation during his testimony on cross-examination. If in fact Magill's answers to the prosecutor's questions were foreseeable, it is difficult to imagine any trial strategy to be served by advising him to take the stand. As Robert Link, an expert in the field of capital defense, testified at the 3.850 hearing:
 
 
 28
 If [Pierce] did know that his client was going to say that [he was guilty of premeditated murder], then he was ineffective for presenting this testimony and convicting him out of his own mouth.... If he did not know, he was ineffective for not knowing. That's his duty.
 
 
 29
 Rule 3.850 Hearing Transcript at 267. Counsel's second error was in failing to object when the prosecutor asked the defendant to concede his guilt to capital murder. As counsel pointed out when the prosecutor asked this question for the second time, that question was the ultimate question for the jury to decide. Counsel's failure to object to the first such question was not nullified by his second objection. His belated objection focused the jury's attention on Magill's second admission that he was guilty of premeditated murder. Counsel's conduct with regard to Magill's guilt phase testimony was constitutionally deficient and resulted in a breakdown of the adversary process.[13]
 
 
 30
 Next, Magill complains that Pierce's opening argument conceded guilt without explaining the theory of the defense. In Francis v. Spraggins, 720 F.2d 1190 (11th Cir.1983), cert. denied, 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985), we held it was unreasonable for an attorney to express his personal opinion as to his client's guilt during the guilt phase in order to maintain credibility with the jury during the penalty phase. Id. at 1194. Francis is different from this case because the defendant in Francis maintained that he was not involved in the homicide. Magill confessed that he had killed Ms. Young, so it is more understandable for his attorney to concede that Magill killed his victim. The ineffectiveness arises in Pierce's failure to explain that, although Magill killed the victim, his alleged lack of premeditation would preclude a conviction for first degree murder.
 
 
 31
 Counsel's lack of clarity regarding the defense theory carried over into his closing arguments. The initial closing argument was merely a repeat of the opening argument. The jury was told to listen to the court's instructions regarding lesser included offenses but was not told how defendant's testimony supported a verdict of second degree murder. In light of defendant's admission of guilt to premeditated murder, counsel was required to do more than merely allude to the helpful portions of Magill's testimony without attempting to limit the damage done during cross-examination. Similarly, counsel's rebuttal closing argument gave no reasons upon which the jury could reduce the charge of capital murder to second degree murder. Since counsel made no attempt to explain his theory of defense to the jury, Magill was denied the "counsel" guaranteed by the Sixth Amendment.
 
 
 32
 Having found that counsel's performance was deficient, we must now determine whether this deficiency affected the outcome of the trial.
 
 
 33
 Magill has not shown a reasonable probability that counsel's performance affected the jury's verdict that Magill was guilty of first degree murder. See Strickland, 466 U.S. at 693, 104 S.Ct. at 2067. The state presented substantial evidence (including Magill's taped confession) that the murder was premeditated. Counsel's errors occurred, for the most part, after the state rested. Therefore, it is highly unlikely that his deficient performance affected the jury's verdict during the guilt phase. Since counsel's performance, deficient though it was, does not undermine our confidence in the reliability of the guilt phase outcome, Magill's conviction should stand.
 
 
 34
 We find, however, that Pierce's failures during the guilt phase, along with some less egregious failures by Stancil during the penalty phase, affected the outcome of the penalty phase of the trial. Although the guilt and penalty phases are considered "separate" proceedings, we cannot ignore the effect of events occurring during the former upon the jury's decision in the latter. See, e.g., Smith v. Wainwright, 741 F.2d 1248, 1255 (11th Cir.1984), cert. denied, 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985). Pierce conceded in his opening argument that Magill killed Ms. Young. Thus, it was apparent early in the guilt phase that the jury's choice even at that stage was between a conviction for capital murder and a conviction for a lesser degree of murder entailing life imprisonment. The distinction between the two phases of this trial was blurred further by the fact that Pierce spent much of his time during the guilt phase arguing that Magill's life should be spared. Under these circumstances, it is likely that events during the guilt phase had an unusually strong impact upon the outcome of the penalty phase. The state did not produce any additional evidence during the penalty phase and the trial court specifically instructed the jury at the end of the penalty phase that it should consider the evidence presented during the guilt phase in making its sentencing recommendation. Trial Transcript at 604.
 
 
 35
 Aside from Magill's age, the most compelling mitigating factors in this case were Magill's emotional problems and the fact that the killing was an impulsive act unlikely to be repeated. Magill's guilt phase testimony dealt a devastating blow to the persuasiveness of these mitigating factors. He twice testified that the killing was intentional and premeditated, and indicated that only the first shot fired was impulsive. Counsel's opening and closing arguments did nothing to raise a reasonable doubt in the jurors' minds that the killing was impulsive or that Magill's ability to premeditate was affected by his emotional problems. Lingering doubts as to whether the murder was premeditated can be an important factor when the jurors consider whether to recommend the death penalty. Cf. King v. Strickland, 748 F.2d 1462, 1464 (11th Cir.1984) (lingering doubt as to guilt or innocence), cert. denied, 471 U.S. 1016, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985).
 
 
 36
 In addition to the prejudicial carry-over effects resulting from Pierce's ineffectiveness during the guilt phase, Magill's sentencing phase case was prejudiced by Stancil's failure to present available mitigating evidence. Dr. Martinez-Monfort, who treated Magill after Magill's first episode of indecent exposure, could have testified that Magill exhibited signs of serious emotional problems at the age of thirteen. In his testimony at the 3.850 hearing, he described Magill as more than just impulsive. He found him to be "explosive," and "a time bomb." Based on his examinations in 1973 and 1974, he "definitely would have projected" the appellant could be involved in a crime of this magnitude.
 
 
 37
 We cannot accept the district court's view that Stancil made an informed, strategic choice not to call Dr. Martinez-Monfort as a witness during the penalty phase. On the contrary, Stancil stated at the 3.850 hearing that he would have called Martinez-Monfort at the sentencing hearing if the doctor had been present. Rule 3.850 Hearing Transcript at 165-66. Stancil could not recall specifically what efforts, if any, he had made to contact Dr. Martinez-Monfort. Id. at 154, 158, 165. He said he could neither confirm nor deny Mrs. Magill's testimony, id. at 226, that she was present when Stancil had a pretrial telephone conversation with Martinez-Monfort regarding the doctor's treatment of Magill. Id. at 154. Thus, there is no evidence that Dr. Martinez-Monfort was unavailable to testify at trial. This doctor's testimony would have been more persuasive than the testimony of Dr. Bruce Hartley and Terry Wagner, and would have provided the jury with a more long-term view of Magill's emotional problems.
 
 
 38
 Moreover, Monfort's testimony would have been much more helpful than that of Dr. Barnard. Dr. Barnard, a court appointed psychiatrist, dealt the defense a devastating blow when he testified on cross-examination that Magill was not under the influence of an extreme emotional or mental disturbance at the time of the crime. This testimony, from a defense witness, virtually precluded the jury from finding that Magill had established one of the statutory mitigating factors. See Fla.Stat.Ann. Sec. 921.141(6). Dr. Barnard testified that he had never been asked by defense counsel to examine Magill regarding the applicability of the statutory mitigating circumstances. Stancil testified that he spoke briefly with Dr. Barnard prior to the beginning of the penalty phase. Because Stancil had ample opportunity to discover Dr. Barnard's opinion that the statutory mitigating circumstance sought to be proved was inapplicable, we find that Stancil's decision to call Barnard as a witness--in addition to Stancil's failure to secure the testimony of Dr. Martinez-Monfort--constituted acts outside the wide range of professional competence.
 
 
 39
 The combination of Pierce's errors during the guilt phase, Stancil's errors during the penalty phase, and the trial court's instruction to the jury to ignore certain nonstatutory mitigating evidence (see Section IV infra ) undermine our confidence in the reliability of Magill's sentencing proceeding. The jury's weighing of aggravating and mitigating circumstances is always a delicate process, and it is difficult to predict with certainty the effect which constitutional errors had upon that weighing process. See State v. Dixon, 283 So.2d 1, 10 (Fla.1973) (Florida sentencing statute does not envision "a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances"), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). The mitigating evidence presented to the jury in this case was sufficiently compelling to justify the conclusion that the above-listed errors affected the jury's decision. This case involves a crime committed while the defendant was a minor. An argument has been made in this case that Magill's age (17) at the time of the crime constitutes a complete bar to the imposition of the death penalty in this case. Although we do not reach this issue, see Section VI, infra, we do note that Magill's age at the time of the crime is a powerful mitigating circumstance. See Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982) ("youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and psychological damage"); In addition to his youth, Magill introduced evidence of his emotional disturbance and the fact that he had never been involved in a violent crime. Under these circumstances, "there is a reasonable probability that, but for counsel's errors [and the other constitutional errors in the case], the result of the [sentencing] proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. Accordingly, we must vacate Magill's death sentence.
 
 IV. NONSTATUTORY MITIGATING EVIDENCE
 
 40
 Magill's second claim for relief is that the trial court impermissibly limited the introduction and consideration of nonstatutory mitigating evidence. During Magill's penalty phase testimony, the following discussion took place:
 
 
 41
 Q. [By Defense Counsel] How do you feel at this time, Paul, concerning the acts that you have done?
 
 
 42
 MR. OLDHAM [Prosecutor]: Objection, Your Honor. He's asking how he feels as to some act he's done, and that calls for a conclusion of the witness. How he feels or doesn't feel is not pertinent to phase two of this proceeding.
 
 
 43
 BY THE COURT: Objection sustained.
 
 
 44
 Q. (BY MR. STANCIL): Do you have any statement you would like to make at this time, Paul?
 
 
 45
 MR. OLDHAM: Objection, Your Honor. Any statement--he should ask the witness a question, Your Honor.
 
 
 46
 BY THE COURT: Sustained. Members of the Jury, we'll complete this and hear arguments of Counsel and the Court will read to you what factors you are to consider in aggravation and in mitigation and I'm sustaining the objections because they fall without purview [sic] of these factors set forth by Statute, by the Legislature, which you should consider in mitigation. Therefore, the objection is sustained in this case. You understand that.
 
 
 47
 Trial Transcript at 566-67 (emphasis added). Magill claims the trial court's comments not only prohibited the introduction of Magill's relevant testimony, but also instructed the jury to ignore all evidence which did not tend to prove the existence of a statutory mitigating circumstance. Furthermore, Magill points to the court's formal instructions to the jury at the conclusion of the sentencing phase as evidence that the jury believed it was limited to the consideration of statutory and mitigating circumstances. The court instructed the jury as follows:
 
 
 48
 The aggravating circumstances which you may consider, are limited to such of the following as may be established by the evidence: [listing statutory aggravating circumstances].
 
 
 49
 * * *
 
 
 50
 The mitigating circumstances which you may consider, if established by the evidence, are these: [listing statutory mitigating circumstances].
 
 
 51
 Trial Transcript at 604, 606. Magill contends this instruction, along with the court's earlier refusal to admit Magill's testimony in mitigation, deprived him of the individualized sentencing determination required by the Eighth Amendment as interpreted in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); and, most recently, in Hitchcock v. Dugger, --- U.S. ----, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).
 
 A. Procedural Default
 
 52
 The district court held that federal habeas review of this claim is barred because of Magill's failure to raise this claim on direct appeal to the Florida Supreme Court. On direct appeal, Magill's brief raised a claim that "the trial court erred in sustaining the prosecutor's objection to the following question asked Paul during the penalty phase: 'How do you feel at this time, Paul, concerning the acts you have done?' " Respondent's Appendix, Tab Z at 81-82. Magill argued that the Florida death penalty statute permitted the introduction of all relevant mitigating evidence and that the trial court erred in refusing to allow Magill to testify as to his remorse. The Florida Supreme Court reached this issue and noted that a defendant's "state of mind three or four months [after the crime], when facing the death penalty, may or may not be relevant. In any event, the record shows many instances when defendant was allowed to bring out remorse as a mitigating factor. The error, if any, in not allowing defendant to once again express remorse is harmless." Magill I, 386 So.2d at 1190.
 
 
 53
 The state claims that the arguments raised on direct appeal did not preserve the Lockett issue because Magill should not be allowed to "elevate a simple evidentiary complaint into a claim that evidence relevant to nonstatutory mitigating circumstances was restricted, nor catapult the instant claim beyond the barriers of procedural default." Appellee's Brief at 45-46. We reject the state's argument. Magill's brief on direct appeal raised more than a "simple evidentiary complaint." It stressed the fact that "the humanity of the defendant is an important consideration for the jury" and that the defendant's remorse and pleas for mercy should be considered in mitigation of the death penalty. While the brief does not cite to federal cases in support of this claim, it "at least provided [the Florida Supreme] Court with some of the elements of a constitutional argument." Cooper v. Wainwright, 807 F.2d 881, 887 (11th Cir.1986). Magill clearly was not attempting to "sandbag" the state courts by withholding the Lockett issue for federal habeas review in the hopes of obtaining a favorable state court decision on other grounds.
 
 
 54
 We conclude that there was no procedural default. Lockett, which first announced the rule that the sentencer may not be precluded from considering nonstatutory mitigating circumstances, was decided twelve days after the oral argument on direct appeal in this case. After the Florida Supreme Court issued its opinion in Magill I, Magill submitted a motion for rehearing in which he pointed out that the court "may have overlooked" Lockett in making its decision regarding Magill's claim that "the trial court erred in excluding relevant evidence concerning appellant's mental state during the penalty phase" of trial. Record, Vol. II at Tab 13. The Florida court considered this motion, omitted one sentence from its opinion, and otherwise denied the motion. Under the foregoing circumstances, given that Lockett recognized a new federal constitutional claim, we hold that Magill fairly presented this issue on direct appeal. As a result, our review of this issue is not precluded by the procedural default rule of Smith v. Murray, 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986).[14]
 
 B. Merits
 
 55
 There are conflicting statements in the record regarding whether the trial court in this case believed it was limited to the consideration of statutory mitigating circumstances in making its sentencing decision.[15] The court's ruling excluding Magill's proposed expression of remorse as "without [the] purview" of the statutory factors certainly indicates its belief that the statutory list of mitigating factors was exclusive. The court could have gleaned support for this proposition from Cooper v. State, 336 So.2d 1133, 1139 (Fla.1976) ("the sole issue in a sentencing hearing under section 921.141 Fla.Stat. (1975), is to examine in each case the itemized aggravating and mitigating circumstances. Evidence concerning other matters have [sic] no place in that proceeding"), cert. denied, 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 239 (1977). On the other hand, the court ruled (over the prosecutor's objection) that the jury could consider Dr. Barnard's testimony regarding Magill's emotional problems "for what it's worth," even though the doctor had specifically stated that the statutory mitigating circumstance--extreme mental or emotional disturbance at the time of the crime--was not present. Trial Transcript at 531-33. This indicates the court's belief that evidence which tends to prove, but does not prove, a statutory mitigating circumstance nevertheless may be considered by the jury. See also id. at 608 (instructing jury that "you should consider all of the evidence tending to establish one or more mitigating circumstances and give that evidence such weight as you feel it should receive in reaching your conclusions as to the sentence which should be imposed").
 
 
 56
 Whether or not the trial court believed it could consider nonstatutory mitigating circumstances, Magill's sentence must be vacated because the jury was led to believe its inquiry was so limited. When the trial court denied Magill the opportunity to express his feelings regarding the crime, the court explained to the jury that such comments would be "without [the] purview of these factors set forth by statute...." Since Magill was the last witness in the sentencing phase, this instruction likely carried significant weight when the jurors retired to consider their decision. Next, the court instructed the jury that "the mitigating circumstances which you may consider, if established by the evidence, are these: [listing statutory mitigating circumstances]." In Hitchcock, the Supreme Court was faced with an instruction nearly identical to the one involved in this case,[16] and held that "it could not be clearer that the advisory jury was instructed not to consider ... evidence of nonstatutory mitigating circumstances, and that the proceedings therefore did not comport with the requirements of Skipper, ... Eddings, ... and Lockett...." 107 S.Ct. at 1824. Finally, the jury verdict form in this case provided that:
 
 
 57
 We, the Jury, have heard evidence under the sentencing procedure in the above cause as to whether aggravating circumstances which were so defined in the Court's charge, existed in the capital offense here involved, and whether sufficient mitigating circumstances as defined in the Court's charge, do outweigh such aggravating circumstances, do find and advise that the aggravating circumstances do outweigh the mitigating circumstances.
 
 
 58
 Trial Transcript at 612 (emphasis added). Based on the above, "it could not be clearer" that the advisory jury was instructed not to consider evidence of nonstatutory mitigating circumstances.
 
 C. Harmlessness of the Lockett Error
 
 59
 Several arguments have been raised by the state and the courts below that any Lockett error which occurred at trial was harmless beyond a reasonable doubt. First, the district court and the Florida Supreme Court indicated that the errors were harmless because Magill in fact was permitted to introduce evidence of nonstatutory mitigating circumstances during the sentencing phase. This argument ignores the fact that the introduction of nonstatutory mitigating evidence is meaningless if the jury is instructed not to consider that evidence. See, e.g., Hitchcock, supra, (defendant introduced evidence of nonstatutory mitigating circumstances, but court told the jury to limit its inquiry to statutory mitigating circumstances). In fact, it is precisely because such evidence was persuasive that the jury's failure to consider the evidence was prejudicial. Magill testified during the guilt phase that he felt remorse for his actions:
 
 
 60
 I feel very sorry that this happened. Previous--prior to this crime, I had spent part of my time working in volunteer organizations, trying to help people out, and this was totally against my thinking, to harm a person like that.
 
 
 61
 Trial Transcript at 428. The court's explanation to the jury after sustaining an objection to similar testimony during the penalty phase, along with the court's instructions at the end of the penalty phase, clearly advised the jury that such evidence was irrelevant to its decision. When a crime is committed by a minor, the defendant's remorse and desire to repent are particularly relevant mitigating factors. As is discussed above, Magill presented compelling mitigating evidence regarding the statutory mitigating circumstances. This evidence included: (1) his age at the time of the crime; (2) his lack of prior violent criminal activity; and (3) the testimony of his probation officer, clinical psychologist, high school teacher, and mother that he was an emotionally disturbed youth who could not express emotion except through socially unacceptable behavior. We cannot say that adding evidence of nonstatutory mitigating circumstances to this already compelling evidence would not have affected the jury's recommendation. The district court erred in holding that the Lockett error was harmless.
 
 
 62
 Second, it is argued that any errors committed during the sentencing phase were rendered harmless when the trial court (upon remand from the Florida Supreme Court) resentenced Magill to death after a new hearing in 1981. Although the court in the 1981 hearing considered the nonstatutory evidence and, in fact, found one nonstatutory mitigating circumstance, the resentencing did not render harmless the Lockett error of the original sentencing proceeding.
 
 
 63
 The Florida Supreme Court in Magill I remanded for resentencing--without a new advisory jury--so that the trial court could list the mitigating circumstances which it considered in imposing sentence. After holding a limited hearing (Mrs. Magill was the only witness), the trial court reimposed the death sentence. It is significant that in imposing sentence, the court specifically relied on the jury's recommendation from the original hearing. See Respondent's Appendix, Tab H-1. Thus, it cannot be said that errors which occurred during the penalty phase of trial had no effect on the court's decision to reimpose the death sentence.
 
 
 64
 More importantly, to hold that resentencing by the court cleanses the taint of the original proceeding would ignore the importance of the advisory jury to the Florida sentencing scheme. The essence of Magill's Lockett claim is that but for the limitation on nonstatutory mitigating circumstances the jury probably would have advised the court to sentence Magill to life imprisonment. If the jury had made such a recommendation, the court would have been bound to follow it unless the facts justifying a death sentence were so clear and convincing that virtually no reasonable person could differ as to the appropriateness of the death penalty. See Tedder v. State, 322 So.2d 908, 910 (Fla.1975). On the facts of this case, it is almost inconceivable that the court could have overridden the jury's recommendation of life.
 
 
 65
 We cannot hold that the subsequent resentencing by the court purged the taint of the original proceedings without infusing an unacceptable level of arbitrariness into the administration of the death penalty in Florida. The error can be cured only by a sentencing proceeding before a new advisory jury.
 
 
 66
 This result is not inconsistent with Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), where the Court held that Florida's death penalty statute was constitutional even though the trial judge was permitted, in some instances, to override the jury's recommended sentence. Although Spaziano indicates that a state may allocate the sentencing power as it wishes between the judge and jury, it does not stand for the proposition that the state may arbitrarily alter this allocation as it applies to particular defendants. Under Florida law, a capital defendant is entitled to have a sentencing proceeding before a jury. A capital defendant is no less entitled to that advisory jury sentence merely because his original sentencing proceeding was infected by constitutional error.[17] Cf. Funchess v. Wainwright, 772 F.2d 683, 692 (11th Cir.1985) (resentencing by jury not required where initial sentencing proceeding was "free of serious error"), cert. denied, --- U.S. ----, 106 S.Ct. 1242, 89 L.Ed.2d 349 (1986); Proffitt v. Wainwright, 756 F.2d 1500, 1503 (11th Cir.1985) (same). Indeed, when the Florida Supreme Court in Magill remanded for resentencing without a jury, it did not believe that the penalty phase was tainted by constitutional error. The court merely remanded so that the trial court could amend its findings of fact in support of the death penalty. In contrast, when the Florida Supreme Court believes the sentencing proceeding is marred by serious error, it has remanded for resentencing by a new advisory jury. See, e.g., Lucas v. State, 490 So.2d 943, 946 (Fla.1986); see also Mann v. Dugger, 817 F.2d 1471 (11th Cir.1987) (instructing district court to grant writ unless state provides new sentencing hearing before advisory jury). In order to avoid the arbitrary application of the death penalty in Florida, we hold that Magill cannot be resentenced to death unless a new advisory jury is empaneled to consider his penalty.
 
 V. EXCLUSION OF JUROR
 
 67
 Appellant's third claim involves the voir dire and exclusion of veniremember Bonner. Mrs. Bonner was the sixth person questioned, and like the others before her she was asked if she "believed in the imposition of capital punishment where the law so provides." She responded that she did. She was then asked, as were the five preceding veniremembers, whether "the mere fact that this Defendant may be under the age of twenty-one, would that create any bar where you could not vote to find him guilty or you could not vote for the maximum penalty of death?" Mrs. Bonner answered that age would influence her decision. Defense counsel objected to the question but was overruled. The prosecutor continued to probe the point and asked for the following clarification: "In other words, knowing that he was under the age of twenty-one, even though the evidence showed that he was guilty beyond and to the exclusion of a reasonable doubt, you could not vote to find him guilty of murder in the first degree?" "That's correct," responded Mrs. Bonner. She further agreed that it was not simply this case, but in any case of an underage defendant she would not vote to convict on a capital charge. The trial judge then excused her on the basis of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
 
 
 68
 Appellant contends that Mrs. Bonner should not have been excluded for cause because her answers, considered in context, indicated merely that she would have given "controlling weight" to a particular mitigating circumstance. Since age is a mitigating circumstance approved by statute, her view could not have run afoul of Witherspoon. Appellant emphasizes that this is the only reasonable interpretation of her statements since the prosecutor improperly led Mrs. Bonner to believe age was not a mitigating circumstance. Appellant further contends that the entire venire was misled on this point, and therefore the selection process resulted in a jury conditioned to ignore a proper mitigating circumstance, all in violation of Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). We disagree with both contentions.
 
 
 69
 First, we must point out that neither Mrs. Bonner nor the venire was misled in violation of Lockett on this issue. Just before Mrs. Bonner was questioned, the trial judge informed the venire, in deference to defense objections, that age was a proper consideration in sentencing. He then explained that the questions were not directed to identifying those jurors who would view age as one of a number of mitigating circumstances. They were directed only to identifying those jurors who would consider age to the exclusion of all other factors, and who would therefore never vote for the execution of a juvenile. Prospective jurors in the latter category can be identified at voir dire without violating Lockett. That case holds only that a capital sentencer "cannot be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any circumstances of the offense." See 438 U.S. at 606, 98 S.Ct. at 2965. Nothing at voir dire precluded consideration of age in sentencing since the role of that factor was properly recognized and later reinforced by the parties' closing arguments and the trial court's instructions.
 
 
 70
 Furthermore, we find that Mrs. Bonner was properly excluded on the basis of this line of questioning. The correct standard for exclusion of jurors in capital cases was restated by the Supreme Court in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). A trial court must determine "whether the juror's view would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " Id. 105 S.Ct. at 854 (quoting Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)).
 
 
 71
 Florida's sentencing statute provides that age is a mitigating circumstance. It does not state that a defendant's minority is a complete bar to capital punishment. Consequently, the statute allows for cases in which aggravating and mitigating circumstances balance in favor of imposing the death sentence on a juvenile. Mrs. Bonner indicated, however, that if she faced such a case, she would not vote for the death penalty. Indeed, she explicitly stated that she could not even convict a juvenile if the evidence proved guilt of a capital offense. These remarks do not suggest that age was simply one factor which Mrs. Bonner would consider. They show that age was the only factor she would consider at either the guilt or penalty stage. Clearly Mrs. Bonner was unwilling to apply Florida's criminal statutes as written and therefore she was properly excluded from appellant's jury.
 
 VI. OTHER CLAIMS
 
 72
 Given our disposition of Magill's first two claims, we need not consider Magill's final two challenges to his death sentence. Any comment with regard to his Eighth Amendment challenge to the imposition of the death penalty upon a person who is a minor at the time of his crime is particularly inappropriate given the Supreme Court's recent grant of review in a case raising this issue. See Thompson v. Oklahoma, 724 P.2d 780 (Okla.Crim.App.1986), cert. granted, --- U.S. ----, 107 S.Ct. 1284, 94 L.Ed.2d 143 (1987). Magill should suffer no prejudice from our decision not to address this claim. In the event that the death penalty is reimposed in this case, we hereby stay the execution of such a sentence until the Supreme Court renders its decision in Thompson.
 
 VII. CONCLUSION
 
 73
 As is discussed above, the penalty phase of Magill's trial was adversely affected by the ineffectiveness of counsel and by the advisory jury's failure to consider nonstatutory mitigating circumstances. The combined effect of these constitutional errors rendered the penalty phase of Magill's trial fundamentally unfair. The district court is instructed to grant the petition for writ of habeas corpus subject to the state granting him a resentencing hearing before an advisory jury.
 
 
 74
 REVERSED.
 
 
 75
 FAY, Circuit Judge, concurring in part and dissenting in part.
 
 
 76
 I join in the result reached by the majority opinion and most of what is written. Most respectfully, I dissent from that portion of Section III which excludes the preparation and work done by Stancil in evaluating the effectiveness of counsel. Pierce and Stancil did confer, were working together and jointly represented the petitioner. To decide this case based solely upon the conduct of Pierce is simply wrong and contrary to the record. In my opinion, appellate courts are not free to sort through a record and select only those portions of it that seem to support a particular theory advanced by a litigant. It seems to me that such an approach establishes extremely unsound precedent. The majority concludes that the conduct of counsel does not undermine our confidence in the reliability of the guilt phase outcome and I agree.
 
 
 77
 I also agree with the majority that the conduct of both Pierce (even though Pierce absented himself concerning the sentencing phase of the trial) and Stancil fell below the standards of Strickland and affected the jury's recommendation in the sentencing phase.
 
 
 78
 With deference, I dissent from Section IV of the majority opinion but such a disagreement is of no moment since we are ordering a new sentencing proceeding and the law has now been clarified concerning non-statutory mitigating factors and instructions in that regard under Florida law. See Hitchcock v. Dugger, --- U.S. ----, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). I would affirm the finding of procedural default on this issue.
 
 
 79
 I join in Sections I, II, V, VI and VII and the result.
 
 
 
 [1]
 One of the few factual disputes at trial was whether the third shot (to the chest) occurred before or after the victim was dragged into the bushes
 
 
 [2]
 A charge of kidnapping was nolle prossed
 
 
 [3]
 Mrs. Magill testified that a prime example of Magill's emotional repression occurred on December 22, 1976, the day before the murder. Several days earlier, Magill had assembled an artificial Christmas tree in the living room as a present for his mother. Although she was pleased, she asked him to trim the tree. When Mrs. Magill returned home from work on December 22, she was unhappy with the way the tree was trimmed and she disassembled it and put it away. She told Magill about the tree when he came home late that night. He said nothing, and simply went to his room. The next time Mrs. Magill saw her son was the next day at the sheriff's office after the crime
 
 
 [4]
 The third mitigating circumstance is a nonstatutory mitigating circumstance. In the court's findings of fact this circumstance is inserted, in handwritten form, beneath the other two
 
 
 [5]
 The move also surprised Magill's mother, who assumed Pierce was the prosecuting attorney. Rule 3.850 Hearing Transcript at 228
 
 
 [6]
 The following is counsel's opening argument, in its entirety:
 BY MR. PIERCE: May it please the Court. Good morning. I'm not going to tell you a novel or story this morning. I'm going to tell you something that may shock you more than you feel. Mr. Oldham has told you the narrative type of thing of what he intends to prove. Ladies and gentlemen of the Jury, we don't deny that. However, we are seeking to protect and save a man's life. Mr. Magill has advised me on several occasions, as recently as about three or four minutes ago, that he's going to take that stand and he's going to testify before you and he's going to testify to the truth. You don't have to depend on a tape. You don't have to depend on a written instrument. You can hear it from his own voice.
 Now, I realize this is a heavy responsibility for each and every one of you, a very heavy responsibility. You have an opportunity perhaps to save a man's life, a young man, seventeen years old at the time. Now, I haven't discussed with you during--when we were picking the Jury, the burden of the proof. That's not important. We're not arguing the proof. We're not even arguing the guilt. Mr. Magill wants to take the stand. He want to tell you what happened. He wants you to understand what happened. He wants you to understand the workings of his mind so that you can understand him a bit more than you do now, so, ladies and gentlemen of the Jury, you will hear the entire story, from beginning to end, and then the decision of guilt or innocence and perhaps the decision of life or death will be in your hands. Thank you.
 Trial Transcript at 245-46.
 
 
 [7]
 Pierce did object when the prosecutor asked this question for the second time. The prosecutor responded that "[h]e answered basically those questions before, Your Honor." The court overruled the objection without further explanation. The prosecutor then asked: "Are you guilty of premeditated killing of this girl?" to which Magill responded, "Yes." Trial Transcript at 438
 
 
 [8]
 The following is counsel's initial closing argument, in its entirety:
 MR. PIERCE: Thank you, Your Honor.
 Ladies and gentlemen of the Jury, first I would like to express in behalf of myself and my client, the intense manner in which you have listened to the testimony, listened to the witnesses and your attention today. I am not going to get up here, because you have heard all of the testimony, and tell you that Paul Magill is not guilty. I'm not telling you that; you know it. He's charged in a four-Count Information. The only Count that the Defense is going to speak to you about is Count four, first degree murder.
 There are several degrees of homicide. He's charged with first degree, which is premeditated, and the penalty can be death, and it also can be life with a twenty-five year minimum sentence. However, there is second degree murder and the Court, I'm quite sure, will instruct you on what second degree murder is and I ask you sincerely to listen to the charges as given to you by the Court in reference to second degree murder. There's a third degree murder and he will instruct you as to that. There is manslaughter, which is homicide and, again, I ask you to listen to the Court and the instructions.
 You have heard the Defendant take the stand and tell you the state of his mind on December 23rd, 1976. At the point I am not asking you to free this Defendant; no, but at this time I am asking you, requesting you, to save his life. Thank you.
 Trial Transcript at 448-49.
 
 
 [9]
 The following is counsel's rebuttal closing argument, in its entirety:
 MR. PIERCE: Thank you, Your Honor.
 Ladies and gentlemen of the Jury, I'm going to be very brief, but be it brief, it's quite important, not only to the Defendant but you people on this Jury.
 As the State has stated, we--I have not discussed the first degree Count of this Information, only--but let us go back and look at the testimony a little bit, not for the purpose of determining whether homicide occurred; it did. Not for determining whether a robbery occurred; it did--or any other. However, the case was made by the State out there on a lonely road east of Belleview, by police officers, with this Defendant openly admitting everything. Does that indicate to you a vicious, murderous mind, likely to continue on a criminal course of conduct throughout his lifetime? I suggest it doesn't. He then proceeds, in all honesty and sincerity and truthfulness and openness, to tape the statement. You ladies and gentlemen heard it and we all heard it. Was there any attempt at that point to hide anything from anybody? No. There was not. He took the stand, which he stated he didn't have to, which is true, and he tried to tell you, and I feel quite sure that you understood the sincerity in his voice, his face, to indicate to you the state of his mind when these things occurred. The State will suggest to you that this is a first degree murder, first degree homicide. I suggest to you because of the testimony you heard from this Defendant himself, from the testimony on the tape, from the manner he acted in front of you, this is second degree. This is not premeditated murder. It is second degree murder. I'm not asking you to find him not guilty, no ma'am, no, sir. However, in your wisdom and judgment, if you feel that he's guilty of second degree murder, then we will not have a second stage of this trial and the Judge can sentence him, but it will not be death, in the event you find that this defendant is guilty of second degree murder, or homicide. How, as I've inferred, not one member of this Jury is condoning--or this Court is condoning or the State is condoning or the Defense is condoning or the people out there are condoning this type of conduct; no, sir, absolutely not. However, you've got to think and recall the testimony you heard from this Defendant. He made the case for the State. He gave you the case. He was honest; he was sincere. The burden is heavy. As I inferred to you, talked to you on opening statement, the burden is heavy on your shoulders. In reference to first degree murder, which requires premeditation, as I'm quite sure the Court will instruct you, was there premeditation? Was this thought process of this Defendant all the way down the line to kill this woman? I suggest to you, no. Yes, it was a homicide, but not a premeditated murder. I am suggesting to you that the true verdict would be second degree murder.
 Trial Transcript at 452-55.
 
 
 [10]
 The hearing was held on March 8, 1984, nearly seven years after the trial. Pierce was sixty-eight years old at the time of the hearing
 
 
 [11]
 Counsel's duty to be prepared is, of course, not lessened by the fact that his client admits to committing the acts alleged in the indictment. As the commentary following ABA Standards for Criminal Justice 4-4.1 states:
 The lawyer's duty to investigate is not discharged by the accused's admission of guilt to the lawyer or by the accused's stated desire to enter a guilty plea. The accused's belief that he or she is guilty may not coincide with the elements that must be proved in order to establish guilt in law. In many criminal cases the real issue is not whether the defendant performed the act in question but whether the defendant had the requisite intent and capacity.
 
 
 [12]
 In addition to the acts and omissions discussed in the text, Magill claims his guilt phase counsel was ineffective for: (1) failing to conduct adequate pretrial investigation; (2) failing to cross-examine the medical examiner, who allegedly could have testified that the victim was rendered unconscious by the first gun shot to the head; (3) failing to cross-examine the police officer who investigated this case, and who allegedly made a statement that the killing was not premeditated; (4) engaging in pointless extended cross-examination of inconsequential witnesses; and (5) failing to utilize available psychiatric testimony during the guilt phase to establish the lack of premeditation
 
 
 [13]
 Because Pierce's failure to consult with Magill prior to trial resulted in the unhelpful (and, indeed, damaging) testimony by Magill during the guilt phase, this case is distinguishable from Mays v. Balkcom, 631 F.2d 48, 52 n. 1 (5th Cir.1980) ("brevity of time spent in consultation, without more, does not establish that counsel was ineffective") (emphasis added) and Easter v. Estelle, 609 F.2d 756, 759 (5th Cir.1980) (same)
 
 
 [14]
 Given our holding that Magill has not procedurally defaulted his Lockett claim, we need not decide whether he could have shown "cause" and "prejudice" to excuse such a default. A petitioner may demonstrate cause if he can show that the claim was so "novel" that it was not "reasonably available" to counsel at the time it should have been raised. See Reed v. Ross, 468 U.S. 1, 16, 104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984). We note that this court has yet to deliver an authoritative opinion whether, in light of Reed, Lockett represents a "novel" constitutional claim not "reasonably available" to defendants prior to its issuance in 1978. Prior to Reed, our decisions were conflicting. Compare Foster v. Strickland, 707 F.2d 1339, 1347 (11th Cir.1983) ("It would be difficult to characterize the Lockett claim as 'available' during petitioner's [1975] trial") with Antone v. Strickland, 706 F.2d 1534, 1537 (11th Cir.1983) (no "cause" for failing to raise Lockett claim in 1976 because record indicated counsel's awareness of issue and because futility of presenting objection to state courts did not constitute cause under Engle v. Issac, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)); see also Ford v. Strickland, 696 F.2d 804, 853-58 (11th Cir.1983) (en banc) (Kravitch, J., concurring in part and dissenting in part) (arguing that there was cause for failing to raise Lockett claim where trial preceded Supreme Court decisions in 1976 mandating individualized sentencing determinations in every capital case), cert. denied, 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983). An authoritative resolution of this issue in light of Reed may be forthcoming. See Hargrave v. Wainwright, 804 F.2d 1182 (11th Cir.1986) (Lockett does not constitute "novel" claim under Reed ), vacated for reh'g en banc, 809 F.2d 1486 (11th Cir.1987)
 Our resolution of this issue also makes it unnecesary for us to decide whether the imposition of a procedural bar in this case would constitute an independent and adequate state procedural ground. We note that the Florida Supreme Court has, in another case, considered the merits of a Lockett claim raised for the first time in a petition for rehearing. See Songer v. State, 365 So.2d 696, 700 (Fla.1978), cert. denied, 441 U.S. 956, 99 S.Ct. 2185, 60 L.Ed.2d 1060 (1979). Where the state courts sporadically enforce their procedural default rules, we are not bound by principles of comity to enforce those rules against a habeas petitioner. See Adams v. Dugger, 816 F.2d 1493 (11th Cir.1987), modifying on reh'g, Adams v. Wainwright, 804 F.2d 1526 (11th Cir.1986); Spencer v. Kemp, 781 F.2d 1458, 1470 (11th Cir.1986) (en banc).
 
 
 [15]
 We have noted in the past that the Florida law regarding nonstatutory mitigating circumstances was ambiguous prior to 1978. See Hitchcock v. Wainwright, 770 F.2d 1514, 1517, (11th Cir.1985) (en banc), rev'd on other grounds, --- U.S. ----, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). As the Supreme Court noted in reversing Hitchcock, however, the issue is not what the Florida law actually was at the time of sentencing. Instead, the issue is what the trial court and the advisory jury believed the law to be. 107 S.Ct. at 1823
 
 
 [16]
 In Hitchcock, the trial court instructed the jury that "[t]he mitigating circumstances which you may consider shall be the following: [listing statutory factors]." 107 S.Ct. at 1824
 
 
 [17]
 Of course, where the constitutional error did not affect the advisory jury's decision, or where the error occurred after the jury gave its recommendation, no purpose would be served by ordering that the defendant be resentenced by a jury. See, e.g., Funchess v. Wainwright, 772 F.2d 683, 692 (11th Cir.1985)